**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Roy E. WALKER, Defendant-Appellant.**

**Nos. 84–3461, 84–3605.**

United States Court of Appeals,
Fifth Circuit.

Sept. 18, 1985.

Lemann, O'Hara & Miles, Arthur A. Lemann, III, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., New Orleans, La., William C. Bryson, Washington, D.C., Sara Criscitelli, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GOLDBERG, REAVLEY, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant, Roy E. Walker, appeals from his conviction in a jury trial of various offenses relating to the importation, possession, and distribution of marihuana, and of wire fraud. On appeal, he argues, *inter alia*, that the district court erred in denying his motion to reopen the evidence to permit him to testify in his own defense. We find that the district court exceeded its discretion and reverse and remand for a new trial.[1]

## FACTS AND PROCEEDINGS BELOW

Defendant-appellant, Roy E. Walker, a former New Orleans restaurateur and honorary reserve captain in the Jefferson Parish Sheriff's Office, was convicted in a jury trial of two counts of conspiracy to import marihuana into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 963; one count of importation of marihuana into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 18 U.S.C. § 2; four counts of conspiracy to possess with the intent to distribute marihuana in violation of 21 U.S.C. §§ 841(a)(1), 846; four counts of possession with the intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of wire fraud in violation of 18 U.S.C.

§ 1343. He was sentenced to nine years' imprisonment, consisting of concurrent four-year terms on all counts except the importation and wire fraud charges, a consecutive three-year term on the importation charge, and a consecutive two-year term on the wire fraud count.

Evidence at trial reflected that while in Las Vegas in October 1980, Walker was introduced to Leroy Buras, the head of a massive drug smuggling operation,[2] by their mutual friend and attorney, A.J. Graffagnino. Contemporaneous with this meeting, Buras was told of Walker's position in the reserve force and that Walker was a brother-in-law of Harry Lee, the sheriff of Jefferson Parish. Shortly after their initial meeting, Buras asked Walker to obtain for him a copy of a police report which discussed the November 1980 seizure of five trucks and a shrimp boat, "Will's Folly," which had been caught transporting approximately twenty-one tons of marihuana. Buras had been involved in the smuggling of the marihuana that had been aboard the seized boat and trucks. Walker agreed and obtained a copy of the report, for which he supposedly was paid $5,000. Walker conceded that he had obtained a copy of the report, but denied that he was paid for his assistance.

There was evidence that Buras subsequently asked Walker to become part of his drug smuggling organization, and that Walker, prompted by his serious financial condition, accepted the offer in February 1981. According to immunized testimony by members of the Buras organization, Walker's role was to monitor local police activity when drug shipments arrived into port by boat. The first such operation took place in March 1981 when a shrimp boat, the "Lil Thomas," arrived in a Lafitte, Louisiana port with approximately 20,000

---

1. Since we reverse on this issue, we do not reach appellant's other assignments of error. They present no matter likely to recur on another trial. There is no question of the sufficiency of the evidence.

2. Between 1978 and 1981, Buras' network imported thirteen shipments of marihuana, totalling approximately 550,000 pounds, into the United States. Two of these shipments were seized by authorities when Buras' men attempted to offload the marihuana in American waters.

pounds of marihuana on board. According to the smugglers' testimony, Walker provided a list of radio frequencies and call signs used by local law enforcement officers to enable the smugglers to keep track of local police activity by monitoring radio communications while the drug cargo was being offloaded and hidden in the marshes. There was also evidence that Walker supplied Buras' men with a police walkie-talkie radio from which the smugglers could determine the frequency at which the local police walkie-talkies were tuned. Testimony also indicated that while the boat was being offloaded, Walker cruised in a police car with a deputy of the Jefferson Parish Sheriff's Office and kept Buras informed of local police activity, and that the deputy was paid $25,000 for his role.

There was also evidence that Walker subsequently helped distribute the marihuana that had arrived aboard the "Lil Thomas." Buras left several bales of marihuana in a grey truck outside appellant's restaurant on three separate occasions, and an additional load of marihuana at the home of one of appellant's associates. Walker, under this arrangement, took the bales, sold them, and retained a portion of the sales proceeds in partial payment for his help in providing surveillance when the shipment arrived in port.

The government also presented evidence that Walker took part in the smuggling of a second shipment of 40,000 pounds of marihuana which arrived in New Orleans aboard the vessel "Shady Lady" in May 1981. Walker took part in negotiations for warehouse space to store the cargo once it arrived. He also again took part in surveillance of police activity the night the vessel arrived. There was evidence that for his participation in both the "Lil Thomas" and "Shady Lady" ventures, Walker earned approximately $220,000 in cash.

In July 1981, Buras, along with several of his co-conspirators, fled to Costa Rica after receiving a tip from his attorney, Graffagnino, that he was about to be indicted. One of Buras' accomplices, Frank Smith, subsequently was arrested on February 25, 1982, when he made a return visit to the United States.[3] Shortly after Smith was arrested, Walker and Buras had a telephone conversation during which, according to Buras' testimony, Walker stated that he could get a magistrate to reduce Smith's $350,000 bond in exchange for a bribe of $10,000 and use of a stud horse for breeding purposes. Buras testified at trial that his attorney, Graffagnino, gave the bribe money to Walker. Smith's bond subsequently was reduced to $150,000,[4] which he met. Smith subsequently was convicted of four counts of importing marihuana and was sentenced to twenty years' imprisonment.

Smith's conviction and twenty-year sentence prompted Buras to contact the government and attempt to arrange lighter sentences for himself and his associates, including Smith, in exchange for cooperation in drug cases. Buras and his associates began providing information to the government; in exchange, Smith's sentence was reduced to five years, and Buras and certain smugglers received relatively light sentences.[5]

3. Smith returned to the United States in February 1982 upon learning that his five-month-old son was hospitalized at the Tulane Medical Center with cystic fibrosis and possibly was going to die.

4. The government did not contend, nor do we find any evidence suggesting, that the bond was reduced because the magistrate in question was bribed. The extent of the government's allegation was that Walker defrauded Buras by accepting the money under the guise that appellant would bribe the magistrate, even though he knew full well that the magistrate "never asked, demanded, exacted, solicited, sought, accepted, received or agreed to receive from" Walker anything of value in return for reducing Smith's bond. The magistrate apparently reduced Smith's bond so that he would have the opportunity to visit his dying child. See note 3, supra.

5. Buras pleaded guilty to four counts of importing 156,000 pounds of marihuana, but was sentenced only to ten years' imprisonment. Like the other smugglers, Buras also was subjected to forfeiture of his smuggling assets. Thomas Hutton was sentenced to five years' imprisonment upon pleading guilty to one count of importation with the intent to distribute 64,000 pounds of marihuana. Russell Ougel received a sen-

Information provided by Buras and the members of his organization led to an investigation into Walker's possible involvement in drug smuggling activity. In November 1983, Walker was charged under a superceding indictment[6] with eleven counts of conspiracy to import, importation, conspiracy to possess, and possession of marihuana, and one count of wire fraud in connection with his alleged telephone conversation with Buras and receipt of bribe money from Graffagnino. The case, which was tried to a jury, commenced on Monday, May 14, 1984. The prosecution completed its case-in-chief the following Thursday, May 17, after calling twenty-six witnesses, including Buras, Smith, and six other smugglers testifying under government immunity. The court adjourned for the day at 4:00 p.m., May 17. The defense began its case Friday morning, May 18. In his opening statement that morning, counsel for defense told the jury, "[W]e intend to put Mr. Walker on the stand so Mr. Walker can tell you what—how he came to know Leroy Buras, how he came to know all these other people, and what his business dealings were with them. We intend to go at great length with Mr. Walker into all the allegations that are made by the Government witnesses." The same day, at approximately 3:00 p.m., Walker's attorney requested a brief recess so he could talk to appellant "about possibly testifying in his own behalf." Walker's attorney added that the speed with which the government presented its case-in-chief "caught [him] with [his] ... pants down." The district court granted a recess so that Walker and his attorney could confer.[7] Before the jury was brought back into the courtroom, defense counsel informed the court that he was "absent a couple of witnesses" and

that the defense would be unable to present them that day. At this point, the district court asked whether the defense had available any other witnesses it planned to call to the stand, and asked whether Walker was going to testify. The following dialogue ensued:

"DEFENDANT ROY E. WALKER: I'd like very much to have the opportunity to say something, Judge, because I'm the person here and my life is at the stake. And I think that I have been—excuse me, Judge. I am very emotional. I am very upset. I have put some very personal friends of mine through some experiences that I don't—that I wouldn't want to put anybody through. I have been exposed to this thing. I have been ruled off the race track. I have had so much pressure.... I don't have any money. I was in [my attorney's] ... office until 10:30 last night going over this stuff with just him and I.... [My attorney] ... and I did not find ourselves compatible and still don't. I think [he's] ... done a magnificent job with the circumstances as it is. I have so much pressure on me, Your Honor, that if I have to testify, if I'm forced to get on the stand right now, I—

"THE COURT: I'm not going to force anybody to do anything.

"DEFENDANT ROY WALKER: I'm not saying that. I would love to testify. I would love to testify."

The district court explored the possibility of issuing an instanter subpoena and having one of the two missing witnesses brought into court to testify that afternoon; Walker's attorney tentatively agreed. Defense counsel then informed the district court:

tence of three years after pleading guilty to four counts of possession with the intent to distribute 300,000 pounds of marihuana. Daniel Ronquille pleaded guilty to one count of conspiracy to import 40,000 pounds of marihuana, and received a sentence of six months' imprisonment. Donald Ramsey pleaded guilty to one count of conspiracy to import 50,800 pounds of marihuana, and was sentenced to thirty months' imprisonment.

6. Walker initially was indicted, on one count of conspiracy to import marihuana and two counts of conspiracy to possess with the intent to distribute marihuana, in October 1983, seven months before he went to trial.

7. The district court specified a recess of "fifteen —twenty minutes." There is some indication that the recess actually lasted approximately one hour.

"I just—insofar as making a decision on ... [whether Walker will testify], he doesn't know. His position, as I understand it, is he doesn't feel like he is emotionally prepared or is documentarily prepared that he can take the stand and present the documentation he needs to verify where he was on certain dates and he just doesn't feel like he could—you know, it would be a good idea to take the stand today, is essentially what he has told me."

Defense counsel subsequently withdrew his request to have a subpoena issue for the missing witness. After discussing stipulations on what the two missing defense witnesses would have testified to, the jury was brought in. The following exchange occurred:

"THE COURT: ... Would the defense call its next witness, please?

"[WALKER'S ATTORNEY]: Judge, we don't have any other witnesses.

"THE COURT: In other words, the defense rests?

"[WALKER'S ATTORNEY]: We'll rest, Your Honor."

The government called two rebuttal witnesses and then closed that afternoon, Friday, May 18. No proceedings were held on the weekend.

The following Monday morning, May 21, Walker informed his attorney for the first time that he wished to testify after all. At this point, the jury had not been charged, nor had the parties made their summations. Walker's counsel moved the court to reopen the evidence "solely for the purpose" of allowing appellant to testify and expressed concern that the jury would speculate on why Walker had not testified since the defense had earlier represented that he would take the stand. The district court denied the motion. Following the closing arguments and charge, the jury returned a verdict finding appellant guilty on all twelve counts.

Counsel for defense filed a motion for a new trial and judgment of acquittal. The district court, before ruling on this motion, sentenced Walker to nine years' imprisonment[8] and a parole term of two years. Walker appealed his conviction. Thereafter, new counsel was appointed to represent Walker. Walker's new attorney filed a memorandum supplementing the motion for new trial and for judgment of acquittal. Therein, appellant argued that the district court erred by refusing to grant a weekend trial recess in midafternoon on Friday, May 18, and by failing to reopen the case on the next trial day to permit appellant to testify. The district court did not permit the defense to supplement the record with the memo or supporting documents. The court denied the defense motion for a new trial and judgment of acquittal. Notice of appeal was filed. Appellant's motion to consolidate the two appeals was subsequently granted.

## DISCUSSION

On appeal, Walker argues that the district court abused its discretion by failing to grant a weekend recess to allow appellant time to compose himself and possibly take the stand, by failing to reopen the evidence the following Monday to permit him to testify, and by failing to grant a new trial based on these alleged errors. Finding that the district court's failure to reopen the evidence on Monday, May 21, constituted an abuse of discretion,[9] we reverse and remand for a new trial.

---

**8.** *See* text, *supra,* accompanying note 2.

**9.** While it is perhaps superfluous, we nevertheless note that " '[a]buse of discretion' is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *In re Josephson,* 218 F.2d 174, 182 (1st Cir.1954). The term "does not imply intentional wrong or bad faith, or misconduct, nor any reflection on the judge." *Black's Law Dictionary* (5th ed. 1979) at 10. The capable district judge fairly and competently tried this difficult and doubtless often vexing case. Upon a weighing of the relevant factors, we simply have the definite and firm conviction that, in this one particular, she clearly erred.

■■■ "Generally, the reopening of a criminal case after the close of evidence lies within the sound discretion of the [district] court." *United States v. Ramirez*, 608 F.2d 1261, 1267 (9th Cir.1979); *see also Turner v. United States*, 441 F.2d 736, 739 (5th Cir.1971) (per curiam) ("It appears well settled that the reopening of a case to receive additional evidence is within the Trial Court's discretion."); *Maggard v. Wainwright*, 432 F.2d 941, 942 (5th Cir.) (per curiam), *cert. denied*, 402 U.S. 946, 91 S.Ct. 1639, 29 L.Ed.2d 116 (1971) ("Considerable latitude in discretion is vested in the trial court" in determining whether to reopen the evidence.); *United States v. Molinares*, 700 F.2d 647, 652 (11th Cir.1983) (quoting *Maggard*). The district court's decision whether or not to reopen the evidence will be overturned on appeal only upon a showing that it abused its discretion. *United States v. Thetford*, 676 F.2d 170, 182 (5th Cir.1982), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983). In *Thetford*, we outlined factors which the district court "must" consider in exercising its discretion:

> "In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not 'imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.'" 676 F.2d at 182 (quoting *United States v. Larson*, 596 F.2d 759, 778 (8th Cir.1979)).

*See also Larson*, 596 F.2d at 778 ("In passing on the motion a court should consider a number of pertinent factors: the timeliness of the motion; the character of the additional testimony; and the effect of grant-

ing the motion. The party moving to reopen must provide a reasonable explanation for its failure to present the additional evidence during its case-in-chief."). We analyze the instant case in light of the factors set out in *Thetford*.

*Timeliness of the Motion*

Among the factors the district court must consider is "the timeliness of the motion" to reopen. *Thetford*, 676 F.2d at 182; *see also Larson*, 596 F.2d at 778; *United States v. Phillips*, 575 F.2d 1265, 1267 (9th Cir.1978), *cert. denied*, 444 U.S. 863, 100 S.Ct. 131, 62 L.Ed.2d 85 (1979). After the government presented its rebuttal witnesses on Friday, May 18, the government rested its case. At that time, appellant made no definite indication that he wished to testify and no request was made of the district court to reopen the evidence. At the commencement of the very next day of the trial, however, the defense made its motion to reopen the case in order for Walker to take the stand. While we believe that the delay in making the motion to reopen weighs against appellant's position on appeal, we consider the delay to be minor under all the circumstances. If Walker had elected to take the stand on Friday, as he should have, and the government thereafter was permitted to present additional rebuttal witnesses to counter his testimony, the testimony very likely would have carried over into Monday morning anyway. Except for the loss of a small part of one afternoon, the timing of the defense motion to reopen amounted to little more delay than would have been caused by Walker taking the stand on Friday, May 18.

In *Larson*, which this Court quoted with approval in the *Thetford* decision, a panel of the Eighth Circuit, with Judge Ingraham of this Court sitting by designation, found that the district court had abused its discretion by refusing to reopen the evidence to permit a defense witness to testify. As in the instant case, the defense had rested its case on a Friday afternoon and had sought to reopen the evidence the following Mon-

day morning. The Eighth Circuit noted that "[a]t the time of the motion to reopen, appellants were prepared to tender ... [the new witness] as a witness—she appeared at the courthouse on Monday morning...." 596 F.2d at 779. By finding that the district court had abused its discretion in refusing to allow the new witness to testify, the Eighth Circuit apparently did not consider the untimeliness of the motion to reopen a significant factor. Nor, in the present setting, do we. As in *Larson*, Walker moved to reopen at the beginning of the very next business day following the close of the defense's case. Also as in *Larson*, the defense indicated at the time the motion to reopen was being considered that Walker was prepared to testify immediately; Walker told the court, "I'm ready to testify right now...." Although there was a slight delay during which the defense should have presented the motion, we do not consider it such a significant factor as to govern disposition of this appeal.

*Character of the Testimony*

In *Thetford*, we stated that the district court must also consider the "character of the testimony" that the movant wishes to present upon reopening the evidence. 676 F.2d at 182; *see also Larson*, 596 F.2d at 778. Counsel for Walker, after moving to reopen, stated, "Judge, my only motion at this time would not be to bring in any other witnesses, it would be to reopen the case solely for the purpose of allowing Mr. Walker to testify." The nature of the evidence the defense wished to present, therefore, was the testimony of the defendant, who had not previously taken the stand, in his own criminal trial and addressed to his own alleged activities that were the subject of the prosecution. As a factor in determining whether the district court abused its discretion, the character of the testimony offered by the defense weighs very heavily in favor of Walker.

Without regard to whether there is a constitutional right to testify and the extent to which it might apply,[10] we find that

**10.** The Supreme Court, in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971), wrote that "[e]very criminal defendant is *privileged* to testify in his own defense, or to refuse to do so." (Emphasis added.) The Court subsequently wrote that "[w]hether the defendant is to testify is an important tactical decision as well as a matter of constitutional *right*." *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) (emphasis added). The *Brooks* court made its comment, however, in the context of its consideration of a Tennessee statute which required that a criminal defendant who desired to testify had to do so before any other testimony for the defense was presented. Since the statute served to influence the defendant's decision *whether* to testify or not, the Court held that it violated his right of due process by restricting the accused's defense and depriving him "of the 'guiding hand of counsel.'" 92 S.Ct. at 1895 (quoting *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932)). In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975), the Court, in dicta, stated:

"This Court has often recognized the constitutional stature of rights that, though not literally expressed in the document, are essential to due process of law in a fair adversary process. It is now accepted, for example, that an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings, ...;

to testify on his own behalf, see Harris v. New York, ...; Brooks v. Tennessee ...; ... and to be convicted only if his guilt is proved beyond a reasonable doubt...." (Citations omitted and emphasis added.)

While other Circuits have held that a defendant has a right to testify in his own behalf, *see, e.g., Ashe v. North Carolina*, 586 F.2d 334, 336 n. 3 (4th Cir.1978), *cert. denied*, 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979) ("Additionally, it is established that a defendant has a constitutional right to testify in his own behalf." (Citing *Harris* )); *Alicea v. Gagnon*, 675 F.2d 913, 923 (7th Cir.1982) ("We therefore hold that a criminal defendant has a constitutional right to testify in his own behalf under the fifth, sixth, and fourteenth amendments."); *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 119 (3d Cir.1977) ("It appears that the District Judge's pronouncement of a criminal defendant's constitutional right to testify in his own behalf fairly reflects the recognition of such a right by the federal courts."), we have not had an occasion to determine the nature of this right or the extent to which it exists. *See Wright v. Estelle*, 549 F.2d 971, 974 (5th Cir.1977), *decision adhered to on reh'g en banc*, 572 F.2d 1071 (5th Cir.1978); *Hollenbeck v. Estelle*, 672 F.2d 451, 452 (5th Cir.1982) ("The right to testify has been recognized. 'Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.'" (Quoting *Harris* and citing *Faretta* )); *Winters v. Cook*, 489 F.2d 174, 179–80 (5th Cir.

Walker's testimony in his own defense is of such inherent significance that the district court, as a matter of fairness, should have permitted him to testify. Walker had not testified at all, and his testimony would be of particular interest to the fact finder because he would be testifying as the alleged active participant in the activities which were the focus of the trial. Where the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance.

While no formal proffer of the content of Walker's testimony was timely made,[11] and in other circumstances this might count heavily against him, we do not regard it as of any real significance here. Neither the court below nor government counsel even obliquely raised any question in this regard, and indeed it was evident that the government would oppose, and the court would deny, the request to reopen regardless of any proffer concerning the content of Walker's proposed testimony. Moreover, it was obvious what Walker (who had not already testified) would testify about—namely, his version of his own conduct and statements as portrayed by the government's witnesses and asserted by the prosecution as constituting the offenses charged. These were matters that were, in the vast majority of instances, not covered by the testimony of any of the defense witnesses. It is and was unmistakable, undisputed, and obvious that Walker's testimony would have been highly relevant and significant and in no meaningful sense cumulative. Plainly, Walker's testimony had "exculpatory potential" and "would have enhanced appellant's defense." *Larson*, 596 F.2d at 779.

Apart from what appellant would have testified to, his presence on the stand would have afforded him the opportunity to have the jury observe his demeanor and judge his veracity firsthand. As one Circuit Judge has noted, "The facial expressions of a witness may convey much more to the trier of facts than do the spoken words." *United States v. Irvin*, 450 F.2d 968, 971 (9th Cir.1971) (Kilkenny, J., dissenting). We conclude that the character of this "eyeball testimony," as a matter to be weighed in determining whether the district court should have permitted Walker to testify on Monday, is also a factor falling on the side of appellant.

*Effect of Granting the Motion*

A third factor which the district court must consider is "the effect of the granting of the motion" to reopen the evidence. *Thetford*, 676 F.2d at 182; *see also Larson*, 596 F.2d at 778. Here, there is no indication that the effect of granting the motion to reopen would have prejudiced the government's case.

When Walker's attorney made the motion to reopen, the jury had not yet been charged and closing arguments had not yet begun. In this respect, the instant case is similar to the facts addressed by the

1973); *but cf. Wright*, 572 F.2d at 1074 (Godbold, J., dissenting). Nor do we take up such an examination today. Further, we do not imply that if we were to determine that a defendant had a constitutional right to testify we would necessarily apply a different analysis to the issue presented by this appeal.

**11.** During his sentencing hearing, Walker stated what some of his testimony would have been. Walker indicated that he would have substantiated that he received money from Buras, but that the money was in payment of an outstanding gambling debt rather than for the discussed purpose of bribing a magistrate. Walker specifically denied that he ever implied to Buras or any other person that he would bribe the magistrate. Walker also indicated that he would have substantiated that he gave a copy of a police report to Buras, but that he was unaware that Buras was involved in illicit activity; he said that he supplied the report, which he contended was readily available to the public, at the request of Buras and his mutual attorney, Graffagnino. Walker stated that he supplied the report as a favor to Graffagnino, who had done legal work for Walker and his wife, and had assumed that a legal purpose underlay the request. Appellant further indicated that his testimony would have shown that his financial condition was not as bad as the government had suggested, rebutting the government's position that Walker resorted to crime in order to extricate himself from his financial trouble. Finally, Walker would have testified that he had never been involved in the drug business in any form.

Eighth Circuit in *Larson, supra*, in which the Court wrote:

> "The ... testimony [sought to be admitted through the motion to reopen] would not have carried a distorted importance merely by being introduced after a reopening. First of all, *since neither closing arguments nor jury instructions had yet been delivered,* the ... testimony would have been heard in the orderly flow, with perhaps an intervening continuance, of the defense testimony. But even assuming that the testimony might have derived undue emphasis from its appearance subsequent to all parties resting, a cautionary instruction by the trial judge might have remedied that potential problem." 596 F.2d at 779 (emphasis added).

Similarly, the fact that the motion to reopen here came at the commencement of proceedings the Monday morning following the Friday close of the testimony, and the evidence as a whole, indicates that the reopening would not have disrupted "the orderly flow" of the testimony. Except for the loss of a small portion of Friday, there was no greater setback in time than would have occurred had Walker initially taken the stand on Friday and carried over into Monday. *Larson,* 596 F.2d at 778–79 (holding that the district court should have reopened evidence on the Monday immediately following the Friday close of the defense's case and the evidence to allow a defense witness to testify).

Moreover, the government does not appear to have been prejudiced respecting any potential rebuttal to appellant's testimony. There is no suggestion in the record, the trial court did not find, and the government did not urge below and does not argue now, that the government let any potential rebuttal witnesses go, on the assumption that the evidence was closed and that appellant would not testify, or that any such witnesses had for any reason become unavailable since the defense rested on Friday. Again, this fact parallels the situation in *Larson* in which the Court stated that "[s]o far as [it could] ... ascertain from the record," the prosecution would have no difficulty in assembling its "witnesses ... in rebuttal to the" newly offered testimony. 596 F.2d at 779.

Of perhaps greater potential concern to the government here was the fact that the prosecution, between the time the defense rested and the evidence closed on Friday, presented two rebuttal witnesses. When appellant moved to reopen the evidence the following Monday, the government protested that it was at an "extreme disadvantage" because appellant had had an opportunity to review the evidence that the government put on in rebuttal before deciding to take the stand. We perceive two potential bases for prejudice to the prosecution which might arise if a defendant were permitted to testify following the presentation of the government's rebuttal. First, the government could be prejudiced because the defendant would be able to hear what the rebuttal witnesses had to say and to work his testimony around theirs. Second, the government could be prejudiced because the defendant would be able to learn what the rebuttal witnesses did *not* know or did not testify to, and to decide as a strategic matter that it would be safe for him to take the stand and testify to certain matters. While these concerns might justify a refusal to reopen under another set of facts, our review of the record convinces us that here the government would not have been prejudiced as a consequence of Walker's having had the opportunity to hear the testimony of its rebuttal witnesses.[12]

---

**12.** The district court made no finding of prejudice in this respect. Although it did refer to the fact that the government had put on its rebuttal, it did not find that therefore the government would likely be actually prejudiced by allowing Walker to reopen. Rather, it seems to have been of the view that the mere fact that *any* rebuttal had been put on lessened or eliminated the court's discretion to allow reopening. The court stated:

> "I know of nothing that *permits* me to *let* Mr. Walker testify at this time.
>
> "Mr. Ashley, the procedures generally are that once the defense rests its case, it may reopen, *except discretionary* with the Court, of course, *except when we have the Government*

With respect to the first consideration, whether Walker would have been able to meld his testimony around testimony brought out during the government's rebuttal, to the prejudice of the government, we conclude that he did not learn any important portion of the government's case during its rebuttal evidence. No significant information was brought forth that Walker had not already learned during the government's case-in-chief. The first rebuttal witness, a loan officer of Commercial Bank and Trust Company, testified that appellant had taken out six loans, both business-related and personal, with his bank, and that he believed that the bank had to sue Walker on some of the underlying notes. The second and final rebuttal witness, an Assistant United States Attorney in the civil division of the United States Attorney's Office and chief of the collections unit of that office, explained that his office handles seizures of property through a writ of *fiera facias*. This second rebuttal witness did not testify on any matter other than general background concerning that writ. These two comparatively insignificant witnesses formed the entire government rebuttal. Neither witness' testimony reasonably could have affected appellant's decision to testify or revealed significant information that would aid him in formulating his own testimony.

Likewise, the prejudice that might potentially arise from appellant's learning what the government's rebuttal did *not* cover does not pose a potential problem in the present case. First, it is unlikely that Walker refrained from testifying during the defense's case-in-chief out of fear of what evidence the government was holding back for rebuttal. The substantial evidence brought against him by the eight witnesses who were testifying under government immunity constituted direct, eyewitness testimony concerning his involvement in the charged criminal activity. Under these facts, it is doubtful that appellant held back from testifying because he feared whatever damaging evidence the government had *reserved* for its rebuttal. Second, and more important, the nature of the defense's case-in-chief was such that appellant would have anticipated very little in the way of rebuttal by the government. The defense presented ten witnesses; of these, five were essentially character witnesses. None of the defense witnesses presented strong testimony to counter the government's case.[13] Consequently, there

having already putting on its rebuttal and then rested its rebuttal.

"Now, I certainly want to afford the Defendant every right, but *unless you can point to some law that says I have a right to reopen* for the specific purpose of putting Mr. Walker on the stand to testify, but then I would have to reopen the case also for the Government for additional rebuttal." (Emphasis added.)

**13.** The defense presented Roland Bruno, an assistant horse trainer, who testified that Walker on one occasion had lectured him because he believed that Bruno was a friend of certain men who had been seen smoking marihuana at the racetrack where Walker kept his horses. When asked during direct examination, "Did Mr. Walker ever discuss with you importing marijuana into this country?," Bruno responded, "Are you kidding me? He would never even have nothing like that around the barn." Robert Vaucresson, Leon Salloum, and Frank Heavey testified or were presented for the purpose of testifying to Walker's reputation for truth and veracity. Appellant's mother, Nancy Walker, also took the stand for the defense and testified that she did not believe Walker was smuggling marihuana into the United States.

None of the witnesses for the defense presented significant evidence to counter the government's case. In addition to his character testimony, Bruno testified that Walker and he were at a Kentucky racetrack during May and June 1981. Bruno, however, was unable to remember whether Walker ever traveled back to New Orleans during that time period, nor was he able to recall the exact dates they arrived in or departed from Kentucky. Moreover, Bruno testified that he saw Walker only "an hour or two during the day" when they were in Kentucky. A second defense witness, Robert Padilla, testified that Walker never flashed a large amount of money in his presence nor discussed marihuana. Padilla also testified that he saw the trailer from which Buras allegedly kept radio contact with Walker when the "Lil Thomas" and "Shady Lady" loads arrived, and that it did not contain radio equipment. Padilla, however, admitted that he did not know whether the trailer had held radio equipment prior to the one occasion (at an unspecified time in 1981) when he had been inside it, inspecting it with Walker for

was very little evidence presented by the defense for the prosecution to rebut. It is highly unlikely that Walker refrained from testifying during his case-in-chief because he was uncertain of what testimony the government would present in rebuttal.

We also reject the suggestion that reopening the evidence would have created a conflict in the district court's handling of its docket. The district court noted that it had several trials on its docket, but did not indicate that it was facing a scheduling conflict as a consequence of Walker's attempt to reopen the evidence. Moreover, the facts suggest that this could not have been the situation. As noted, had Walker taken the stand on Friday when the district court asked the defense to present its next witness, his testimony and cross-examination could, and likely would, have carried over into Monday. The government, in turn, might have produced additional rebuttal witnesses, besides the two it did produce, to counter appellant's testimony. After that, of course, the jury would be charged and counsel would make their closing arguments. As late as the late afternoon of Friday, May 18, therefore, the district court could not have already scheduled other trials that would pose any less risk of conflict if appellant were to reopen the evidence than would have been the case if appellant had taken the stand on Friday. We find no indication in the record that the district court was concerned that reopening the evidence would cause a scheduling conflict. Nor do we find the possibility of a conflict any greater had the court reopened the evidence than would have been the case if appellant had taken the stand on Friday.[14] Also as was the case in *Larson*,

possible purchase from him. Daniel Dettwiller, Jr., testified that Walker never displayed a large amount of money in his presence and that appellant had been slow in paying his bills for keeping his horses on Dettwiller's farm. Robert Vaucresson testified only to Walker's reputation for truth and veracity. Charles Touzet testified that Walker never discussed importation of marihuana with him nor flashed large amounts of cash in front of him. Touzet also testified that Walker still owed him more than one thousand dollars on racehorse equipment. Leon Salloum testified that a horse he and Walker co-owned had raced on March 8, 1981, and on one previous occasion, but was unable to remember whether the horse had raced on any other date in March 1981. He also acknowledged that there were no night races during this period. When asked his opinion of Walker's reputation for truth and veracity in the community, Salloum testified, "Well, I imagine he has friends and I imagine he has enemies, but I'm sure his friends think a lot of him and I think his enemies don't think much of him, but that's with everyone."

Walker's former wife, Lorraine Lee, also took the stand for the defense. She testified that Walker never mentioned marihuana. She also testified that she had been with Walker on March 3, 1981, Mardi Gras day, and also had seen him at a party a few days earlier. She testified that she and Walker were separated at the time, though, and was unable to account for his activities on any other evening during early March. An eighth defense witness, Frank Heavey, testified that Walker did not have sufficient funds to purchase a restaurant he was interested in acquiring. Heavey testified that he did not know people in the community who knew Walker, and consequently was prevented from speculating on Walker's reputation for truth and veracity. Shing Fan, an employee at one of Walker's restaurants, testified that he had been on vacation throughout March and had seen Walker only once during that time. He testified that he was unaware of any large amounts of cash or marihuana passing through the restaurant, but added that as a cook he was not conscious of activity outside the kitchen area. The government did not cross-examine Fan. Walker's mother, Nancy Walker, testified that appellant had been away from New Orleans from April through October. When asked whether appellant ever came back to New Orleans during that time, Mrs. Walker responded, "If he did, I didn't see him." She also expressed her disbelief that her son was involved in smuggling or that he possessed the money Buras supposedly had paid him.

14. The instant case is distinguishable from the hypothetical situation posed by the First Circuit in *Blaikie v. Callahan*, 691 F.2d 64, 67 (1st Cir.1982), in which the Court wrote:

"The state has a strong interest in maintaining a stable, predictable trial format with a definite end as well as a beginning. This discourages jockeying for position by the parties and makes it possible to run a workable calendar. Judges, for example, upon being told by counsel that the evidence has closed, may schedule other matters to begin after arguments and charge *on the following day*. If defense counsel is free to insist upon reopening at any time, inconvenience may be caused not only to the court but to other litigants and witnesses awaiting their turn." (Emphasis added.)

"we are not here concerned with the testimony of many additional witnesses, but of one more defense witness." 596 F.2d at 779.

In assessing the effect of granting the motion to reopen, we also consider another respect in which denial of the motion would likely prejudice the defendant. As discussed above, defense counsel told the jury during his opening statement that Walker would testify and address "all the allegations that are made by the Government witnesses." Walker's attorney argued in connection with his motion to reopen that Walker's failure to take the stand after this earlier representation might have the effect of prejudicing the jury against him. Counsel argued:

"And in that opening statement, if you recall, I told the jury that he would testify, so I don't know what effect that's had on the jury at this point. If he doesn't testify, they're wondering, 'Well, did something go wrong?' 'Why?' 'Were we deluded into believing he would testify when, in fact, he didn't?' I'm wondering if they're not sitting up there questioning why he hasn't taken the stand—"

This Court has previously noted the injurious effect that a defendant's failure to take the stand may have on the jury's consideration of his case. *DeLuna v. United States*, 308 F.2d 140, 152 (5th Cir.1962). It is true that the defense created its own trap by representing that appellant would take the stand and then closing without having offered his testimony.[15] Moreover, the government made no comment concerning appellant's failure to testify and the district court instructed the jury that his failure to take the stand could not be held against him. Nevertheless, we note that the effect of granting appellant's motion to reopen would be to further minimize the risk of prejudice against appellant for failing to take the stand. This consideration, as well as the other factors concerning the "effect of granting the motion" to reopen, militates at least to some extent in favor of appellant.

*Reasonableness of Excuse for Request to Reopen*

In *Thetford*, we indicated that the district court, in deciding whether to reopen the evidence, also should consider the reasonableness of the excuse offered by the movant for failing to present the evidence in his case-in-chief. 676 F.2d at 182; *see also Larson*, 596 F.2d at 778. This factor mildly favors Walker's position, or at least does not point in the other direction. On Friday, May 18, Walker told the district court that he "would love to testify." However, he also told the court, "I am very emotional. I am very upset.... I have so much pressure on me, Your Honor, that if I have to testify, if I'm forced to get on the stand *right now*, I—"; at this point, the court interrupted him by saying that it would not force appellant to take the stand. (Emphasis added.) Walker's attorney clarified for the district court that Walker's position was that

"he doesn't feel like he is emotionally prepared or is documentarily prepared that he can take the stand and present the documentation he needs to verify where he was on certain dates and he

In the present case, the district court likely would not, prior to the government's resting its rebuttal Friday afternoon, have scheduled other trials to begin on the following Monday or even the early part of that week.

Of course, it is not wholly inconceivable that the district court made a conflicting scheduling decision late Friday afternoon after the government rested its rebuttal. However, had such been the case, we do not doubt that the district court would have made some mention of it in denying the motion to reopen or the motion for new trial. No such mention is made.

We also note that shortly before the trial recessed for the day at 4:00 p.m. on Thursday, the district court announced its intention to have the case go over into the following week if the evidence was not completed by about 3:00 p.m. on Friday, but that if the defense completed its evidence by noon on Friday and the government had no rebuttal, then the court might have the case go to the jury late Friday afternoon.

**15.** Under the facts here, it is wholly inconceivable that this was a calculated stratagem to lay a basis for a later possible motion to reopen to permit Walker's testimony.

just doesn't feel like he could—you know, it would be a good idea to take the stand *today*, is essentially what he has told me." (Emphasis added.)

The following Monday, after moving to reopen the evidence, Walker and his attorney again explained that Walker had been emotionally unable to take the stand the previous Friday. In response to the district court's comment that it had asked "Mr. Walker if he wanted to take the stand" on Friday, Walker stated, "At that time, Your Honor, *I couldn't.*" (Emphasis added.) [16]

We find that the defense presented an apparently bona fide and not significant-

ly unreasonable excuse for Walker's failure to testify the previous Friday. Moreover, we find no evidence or logic to suggest that Walker moved to reopen the evidence on Monday simply to delay the proceedings, to gain a strategic advantage over the government,[17] or to have the last word in surrebuttal.[18] In fact, the government, addressing the motion to reopen on Monday, May 21, appeared to concede that the reason appellant had not testified on Friday was because of his nervous condition. We acknowledge and agree with the government's argument that it would be difficult to conceive of many defendants who would not feel some nervousness at the prospect

---

**16.** Walker, on Monday, gave an additional excuse to the district court which we find less justifiable:

"Judge, the reason that I didn't want to testify Friday was because I was—I had never even contacted the people that were suppose[d] to testify in my defense. I had never even asked anybody to come up here. I had given [my attorney] . . . a list of people, but we were not speaking of these people to have to come up here for another week or two weeks and I didn't know when they were supposed to be here, Your Honor, and at the last minute when they said it was time to call witnesses, that night and that evening I was calling the witnesses to try to get them in the next day and most of these witnesses, Your Honor—my right hand to God—they could testify to that. I called them that night and never spoke to them about testifying before that, Your Honor."

The district court noted that this excuse was unreasonable since Walker had been indicted seven months earlier and had had all that time to contact his witnesses. *See* note 6, *supra*. We agree. *See United States v. Aiken,* 373 F.2d 294, 300 (2d Cir.), *cert. denied,* 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967) ("Although [the defendant's] . . . counsel stated that the witness could not be located 'on the eve of the defense,' he did not adequately account for his failure to locate her during the five weeks which elapsed between . . . direct testimony relating to [the defendant] . . . and the closing of the proofs. The denial of the motion to reopen was thus not an abuse of discretion.").

Although Walker advanced this excuse for his own failure to testify, it appears that he presented the explanation as an excuse for why the defense wished to present *other* new witnesses. Walker appeared to be under the misapprehension that the defense motion to reopen the evidence would permit him to present new witnesses to support his case. Walker told the court on Monday that he had a witness standing

in the hallway who would testify to certain matters, which he proceeded to outline for the court. At that point, Walker's counsel intervened, "Judge, my only motion at this time would not be to bring in any other witnesses, it would be to reopen the case solely for the purpose of allowing Mr. Walker to testify."

**17.** *See* text, *supra,* discussion concerning the effect of granting the motion to reopen.

**18.** This case is distinguishable from the facts of *Turner v. United States,* 441 F.2d 736 (5th Cir. 1971) (per curiam), and *United States v. Greene,* 497 F.2d 1068 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), in which the defendants already testified during their cases-in-chief and desired only to get a *second* chance to testify in surrebuttal. In *Greene,* the Seventh Circuit sustained the district court's denial of a motion to reopen, and held:

"When the point of completion of a trial has been reached, which was the situation here, the trial judge should be vested with substantial discretionary powers to bring the evidentiary phase to a close, or to put it another way, to curb the natural tendency of vigorous counsel to get in the final word." 497 F.2d at 1083.

We similarly noted in *Turner* that if the defendant were to retake the stand, he only would have reiterated what he and others had testified previously. 441 F.2d at 739. In the instant case, on the other hand, appellant wished to reopen the evidence so that he could testify for the *first time.* His purpose was not merely to get in "the final word," as in *Greene,* or to rehash earlier testimony, as in *Turner,* but to provide his original testimony concerning the charges he was facing. Moreover, in *Turner* and *Greene,* the defense was not burdened with the ill effects of the defendant's not having taken the stand in his own defense.

of testifying at their own criminal trials, although the record indicates that Walker's situation went somewhat beyond this commonplace. Moreover, we by no means rest our decision that the district court abused its discretion on the character of appellant's excuse, which at least in most instances would not alone suffice to carry the day. Weighing his excuse together with the seriousness of the crimes with which appellant was charged, the nature and potential scope of his testimony, the fact that he had not testified at all, the absence of any prejudice to the government or hardship to the court if reopening were allowed, and the timing of the motion, we find that the district court, on balance, clearly should have allowed the defense to put Walker on the stand on Monday, May 21, and exceeded its discretion in refusing to do so.

## CONCLUSION

We emphasize our commitment to the settled principle that decisions on motion to reopen rest in the sound and broad discretion of the district court, and that this extends to motions to reopen to allow a defendant to testify in a criminal case. We fully appreciate that we are generally not in anywhere near as good a position as the trial court to judge of these matters, that we cannot have the "feel" for the case that the trial judge has, and that in any event the efficient administration of justice requires that trial courts have flexibility of decision in managing the mechanics of trial and their dockets. That does not mean, however, that such decisions are always beyond any review. The confluence of all factors in this particular case strongly convinces us that the trial court clearly erred in denying Walker's motion to reopen. Upon examining the relevant considerations, we can "find no valid reason to justify a denial of the defense motion to reopen," *Larson,* 596 F.2d at 779–80, and cogent reasons to grant the motion. Therefore, we reluctantly reverse and remand for a new trial. *See Id.,* 596 F.2d at 780 (concluding that district court had

abused its discretion, appellate court orders new trial "in the interests of justice").

REVERSED and REMANDED.