[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 25, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12188
Non-Argument Calendar

_____

D.C. Docket No. 03-00279-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMIE EDWARD BYRD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(March 25, 2005)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

Jamie Byrd was convicted of armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d); the use of a firearm during the commission of a bank robbery, in violation of 18 U.S.C. § 924(c); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Byrd appeals his convictions on all three counts, contending that the district court abused its discretion in refusing to reopen the evidence in order to allow him to testify. Byrd also appeals his conviction on the first two counts by asserting that the evidence at trial was insufficient to sustain his convictions or, in the alternative, that the convictions were against the weight of the evidence.

## I.

Shortly after 9:00 a.m. on November 10, 2003, an armed individual robbed the National Bank of Commerce in Savannah, Georgia. The robber entered the bank carrying a black revolver with a long barrel and a wooden handle. He ordered, "Nobody move," and walked to a teller's station. He banged his gun on the counter and instructed two tellers to put money on the counter. The robber stuffed the money into his sweatshirt pockets, dropping some of it as he fled. The bank manager calculated that the robber left the bank with $4,680.

There were nine eyewitnesses to the crime. Those witnesses, who were either bank employees or customers, described the robber as an African-American

2

male, between 5'2" and 5'9", and between 145 and 150 pounds. One witness estimated that the robber was either in his late teens or early twenties. The witnesses consistently described the robber as wearing a dark-colored, hooded sweatshirt; dark blue jeans; a mask with eye holes; and white gloves, which may have been latex.

As the man fled the bank, he was observed by Greg Waters, who was looking out of his office window about 150 feet from the bank. Waters watched the man run into a cluster of trees and cut through some bushes. Because the bank had been robbed before, Waters considered a man running from the bank to be highly suspicious. Waters left his office, got into his car, and drove over to see where the man was going. As Waters was driving toward the trees where he had seen the man, a car pulled out. Waters described the car as brown or gold in color and stated that it was probably a Cutlass or a similar model from the early 1980s.

Waters followed the car thinking that it was driven by the man he had seen running from the bank. Waters called 911 on his cell phone and told the dispatcher that the car's tag number was 7821 AWA. After he had given the tag number to the 911 dispatcher, Waters decided there was no further point to following the car. He went back to the bank where he met with Special Agent Freddie Watkins of the FBI. Waters told Watkins what he had observed, and

3

together they retraced the route taken by the man Waters had seen running from the bank. Along that route, they found a $5 bill and a latex glove, which Watkins collected. After Waters had gone, Watkins retraced the route again and found a $10 bill, which he also collected.

Tag number 7821 AWA corresponds to a 1980 gold Buick Century registered to Jamie Byrd at 21 Pritchard Street in Savannah, Georgia. Within thirty minutes of the robbery, Sergeant Ernst of the local police department arrived at 21 Pritchard Street and observed a gold car with that tag number parked in the yard. Ernst reached underneath the bumper and felt the radiator, finding it to be hot; he surmised that the vehicle had been driven recently. Ernst looked through the car's windows and saw "a large frame black revolver with wood grips partially sticking out from underneath the front seat." The gun was later determined to be a .357 revolver loaded with six rounds of hollow point bullets.

While waiting for backup, Sergeant Ernst watched the house. As he did so, a man and woman stepped outside. The man was Byrd, and the woman was Byrd's great-grandmother, Lula Mae McNeil. Byrd is an African-American man who is 5'6" tall and weighs 140 pounds. At the time of the robbery, Byrd was twenty-three years old. McNeil is a home-health provider who keeps latex gloves in her house.

More officers arrived at 21 Pritchard Street. McNeil, who owns the house, gave the officers permission to search. In Byrd's bedroom closet, an FBI agent found a blue-colored, hooded sweatshirt; a mask with two eye holes; and a pair of blue jeans. Another FBI agent found an unlocked, black metal box under Byrd's bed. It contained $4,650 in various denomination bills. The FBI agent observed that there "were certain amounts that were consecutive in a row." The officers arrested Byrd.

Byrd proceeded to trial. After the government had rested its case, the court asked defense counsel whether Byrd would testify, and counsel replied that Byrd would not. The court then asked defense counsel: "Have you given an understanding to Mr. Byrd that he may testify? That's his own choice and no one can deprive him of that right." Defense counsel answered that he had. The court then inquired: "You understand that, Mr. Byrd." Byrd replied, "Yes, your honor."

Byrd then put on several witnesses. McNeil testified that, on the morning of the November 10 robbery, Byrd had gone outside to fix his car. In order to do so, he had driven the car from the upper part of the yard to the back of the house. She testified that he stayed outside for only twenty-five minutes while she sat inside and watched him. Lester Mae Byrd, Byrd's mother, testified that Byrd had purchased auto parts on November 9 and that he had called her on November 10 at

9:30 a.m., the approximate time of the robbery. She also stated that Byrd was in the habit of keeping his money in a little, black chest under his bed instead of in a bank. Various witnesses testified that Byrd had received $5,425.18 from legitimate sources in the first ten months of 2003.

An FBI examiner testified that he had been able to remove "an impression" from the latex glove the FBI found. The impression did not match Byrd's fingerprint or palm print. Vickie Tubbs, a representative of the Motor Vehicle Administration for the Chatham County Tax Commissioner's Office Tag Department, also testified for the defense. She testified that there were one hundred tags issued in Chatham County that began with 78 and ended with AWA. On cross-examination, she acknowledged that the only tag issued with the sequence 7821 AWA was assigned to Byrd's 1980 Buick.

After the defense rested, Sergeant Ernst testified again, as a rebuttal witness. He testified that when he had arrived at McNeil's home on the morning of November 10, McNeil had told him that Byrd "had gotten home just before we, the police, showed up." Ernst also said that, when he had spoken to Lester Mae Byrd on the phone about the robbery, she had not mentioned that she had talked to her son around the time of the robbery. Byrd's mother had told Ernst that, on the

6

morning of the 10th, Byrd had asked to borrow her truck but she had refused, stating she had "had a real bad feeling about it."

The evidence closed after the government put on its rebuttal witness, and the court was inclined to proceed with closing arguments. On defense counsel's request, however, the court agreed to recess for the day and begin closing arguments in the morning.

The next morning, defense counsel informed the court that Byrd had changed his mind and wanted to testify. The court responded, "We closed the evidence yesterday. And all the other witnesses were released. So, any rebuttal that the government would need is gone." The court denied Byrd's request to reopen the evidence stating, "It would be untenable to [the government], with all their witnesses released, for him to then say whatever he wants to without much fear of anybody being around to rebut it." The court sent the case to the jury, which convicted Byrd on all counts. This appeal ensued.

## II.

A criminal defendant has the right to testify on his own behalf. Rock v. Arkansas, 483 U.S. 44, 49, 107 S. Ct. 2704, 2708 (1987). Yet, this right "is not without limitation"; it must sometimes "bow to accommodate other legitimate interests in the criminal trial process." Id. at 55, 107 S. Ct. at 2711 (internal marks

7

and citations omitted). When considering rules that limit a defendant's right to testify, we "must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." Id. at 56, 107 S. Ct. at 2711. We note at the outset that Byrd was not denied his right to testify in his own behalf; he made a knowing and voluntary waiver of that right before the district court.

The decision whether to reopen a case to introduce additional evidence is reviewed only for abuse of discretion. United States v. Cohen, 888 F.2d 770, 775 (11th Cir. 1989). This Court has never reviewed a case involving the district court's refusal to reopen the evidence in order to allow a criminal defendant to testify. We now join the First and Eighth Circuits in holding that an accused's right to testify generally must be exercised at the appropriate time, which is before the evidence-taking portion of the trial has closed. United States v. Peterson, 233 F.3d 101, 105–07 (1st Cir. 2000); United States v. Jones, 880 F.2d 55, 59–60 (8th Cir. 1989). Though the district court may reopen the evidence in order to allow a defendant to testify, its failure to do so usually will not constitute an abuse of discretion. We, like the First Circuit, will consider the factors developed in United States v. Walker, 772 F.2d 1172 (5th Cir. 1985), in assessing whether the district

court abused its discretion in deciding not to reopen the evidence so that Byrd could testify.[1]

**A.**

In United States v. Jones, 880 F.2d 55 (8th Cir. 1989), the defendant, Paul H. Jones, argued that his constitutional rights were violated when the district court refused to reopen the evidence to allow him to testify. Id. at 59. The Eighth Circuit considered Jones's challenge to be governed by the balancing test set out in Rock v. Arkansas, 483 U.S. 44, 107 S. Ct. 2704 (1987). The Court noted that any restrictions on a defendant's right to testify had to be "justified by countervailing interests." Jones, 880 F.2d at 59.

The Eighth Circuit explained that "[w]ithout reasonable rules regulating the presentation of the evidence and arguments, courts could not effectively function." Id. at 60. It concluded that requiring the defendant to testify before the close of

---

[1] There are few decisions in this circuit involving the issue of whether a district court has abused its discretion in agreeing to, or refusing to, reopen the evidence. In the few that we have found, we reviewed for an abuse of discretion without providing a framework for our analysis. See United States v. Gomez, 908 F.2d 809, 810 (11th Cir. 1990) (holding, without further discussion, that the district court did not abuse its discretion in granting the government's motion to reopen the evidence); United States v. Molinares, 700 F.2d 647, 652 (11th Cir. 1983) (holding that the district court did not abuse its discretion in allowing the government to reopen its case to present additional evidence where the ruling caused the defendant no "actual prejudice"). We have not found another case, like Byrd's, where the issue concerned reopening the evidence in order to allow the defendant himself to testify. In this case, we find the Walker factors to be helpful in assessing whether the district court abused its discretion in refusing to reopen the evidence to allow Byrd to testify.

9

the evidence "promotes both fairness and order in trials, interests which, of course, are crucial to the legitimacy of the trial process." Id. Moreover, the requirement "plac[es] only a minor limitation" on the right to testify. Id. at 59–60. Labeling that limitation a "commonsense requirement," the Court believed that it did not "unconstitutionally infringe on the defendant's right to testify." Id. at 59. The Court ultimately held: "The right to testify must be exercised at the evidence-taking stage of the trial. Once the evidence has been closed, whether to reopen for submission of additional testimony is a matter left to the trial court's discretion." Id. The Court concluded there was no abuse of discretion in that case.

The Fifth Circuit in United States v. Walker, 772 F.2d 1172 (5th Cir. 1985), did set out a list of factors to be considered in evaluating whether an abuse of discretion has occurred. At Roy E. Walker's trial, defense counsel told the jury in his opening statement that Walker would testify. Walker, 772 F.2d at 1175. The government concluded its case-in-chief faster than the defense anticipated. Id. Defense counsel called the witnesses who were present and then asked for a recess, which the court granted. Id. When the court reconvened, defense counsel stated that several of the defense witnesses still were not present. Id. The court asked whether the defense had any witnesses available and whether Walker himself was planning to testify. Id.

10

Walker informed the court that he would "like very much to have the opportunity to say something." Id. Walker then described how upset and emotionally unstable he was at the time. He concluded, "I have so much pressure on me, Your Honor, that if I have to testify, if I'm forced to get on the stand right now, I—" Id. At this point, the court interrupted Walker saying, "I'm not going to force anybody to do anything." Id. Walker then stated that he understood he would not be compelled to testify and informed the court, "I would love to testify. I would love to testify." Id.

The court discussed with defense counsel the possibility of issuing instanter subpoenas for some of the defense witnesses and then returned to the subject of whether Walker would testify. Id. at 1175–76. Defense counsel stated that, as of that moment, Walker was unsure whether he wanted to testify. Id. at 1176. Defense counsel explained: "His position, as I understand it, is he doesn't feel like he is emotionally prepared or is documentarily prepared that he can take the stand and present the documentation he needs to verify where he was on certain dates and he just doesn't feel like he could—you know, it would be a good idea to take the stand today, is essentially what he has told me." Id. Defense counsel then withdrew his request to have instanter subpoenas issued. Id. The jury was

11

brought in, and the defense rested.  Id.  The government called two rebuttal witnesses, and the evidence closed that afternoon, a Friday.  Id.

On the following Monday, Walker informed defense counsel that he wanted to testify.  Id.  When the proceedings reconvened, defense counsel asked the court to reopen the evidence in order to let Walker testify.  Id.  The court refused.  Id.

In reaching its conclusion that the district court had abused its discretion, the Fifth Circuit considered the following factors: (1) the timeliness of the motion to reopen, (2) the character of the testimony to be offered, (3) the effect of granting the motion to reopen, and (4) the reasonableness of the excuse for the request to reopen.  Id. at 1177.  These factors were not chosen specifically because the case dealt with the failure to reopen the evidence in order to allow a defendant to testify; instead, these were the factors used by the Fifth Circuit to evaluate all challenges to a district court's refusal to reopen the evidence.  Id.

With respect to the first factor, the Fifth Circuit concluded that Walker's motion to reopen was made in a reasonably timely fashion since it had been made on the first day the proceedings reconvened after the evidence had closed.  Id. at 1177–78.  As to the second factor, the Court presumed the character of the testimony that would have been offered to be of "prime importance" because it was the testimony of the defendant himself.  Id. at 1179.  Examining the third

12

factor, the Court concluded that there was "no indication" that reopening the evidence would have prejudiced the government, id.; however, there was reason to believe that the defendant had been prejudiced by the failure to reopen, id. at 1183.

As to the government, the Court identified four possible sources of prejudice but decided none were present. Id. at 1180–81. First, neither closing arguments nor the jury instruction had taken place; therefore, the "orderly flow" of the proceedings would not have been interrupted. Id. at 1180. Second, it did not appear that any of the government's witnesses had been released or had otherwise become unavailable. Id.

The third and fourth potential sources of prejudice to the government from reopening involved the testimony of the government's rebuttal witnesses. The Court theorized that, having heard the testimony of the rebuttal witnesses, the defendant might have been able to "work his testimony around theirs," explaining any discrepancies between the rebuttal witnesses' testimony and the defense's case. Id. The Court also reasoned that, because the defendant had learned what the rebuttal witnesses did not know, he could have "decide[d] as a strategic matter that it would be safe . . . to testify to certain matters." Id.

In Walker's case, the Fifth Circuit decided that those two types of prejudice were not present. Id. at 1181. On rebuttal, the government had presented "two

comparatively insignificant witnesses . . . . Neither [of whose] testimony reasonably could have affected [Walker's] decision to testify or revealed significant information that would aid him in formulating his own testimony." Id. The testimony of the rebuttal witnesses did not reveal any significant information that had not been revealed during the government's case-in-chief. Id. In addition, the comprehensive nature of the government's case-in-chief and the paucity of the defense case "was such that [Walker] would have anticipated very little in the way of rebuttal by the government" and, thus, would have thought he could gain little strategic advantage from delaying his testimony. Id.

Though the government would not have been prejudiced by reopening the evidence, the Court concluded that Walker had been prejudiced by the failure to reopen. Id. at 1183. In its opening statement, defense counsel had informed the jury that Walker would testify. Id. The government did not mention Walker's failure to testify in its closing statement, and the court instructed the jury not to hold Walker's failure to testify against him. Id. Nonetheless, Walker's failure to testify, after his attorney had stated that he would, may indeed have made a negative impression on the jury. Id. Because the government would have suffered no prejudice from reopening the evidence and Walker probably suffered prejudice

from the failure to reopen, the Court found that this factor weighed in Walker's favor. Id. at 1179–83.

Concerning the final factor, the Fifth Circuit concluded that the reasonableness of Walker's excuse for requesting to reopen "mildly favor[ed] Walker's position, or at least [did] not point in the other direction." Id. at 1183. When defense counsel asked the court to reopen the evidence, he explained that Walker had been "emotionally unable" to testify on the day the evidence closed. Id. at 1184. The district court asked Walker if he had wanted to testify the previous Friday, and Walker responded, "At that time, Your Honor, I couldn't." Id.

In addressing the defense's motion to reopen before the district court, the government apparently conceded that Walker had not testified the previous Friday due to "his nervous condition." Id. The Fifth Circuit understood this nervous condition to go "somewhat beyond the commonplace" feeling of nervousness that every defendant would feel before taking the stand. Id. at 1184–85. When coupled with the lack of strategic reasons for delay, the Court found this excuse to be "apparently bona fide and not significantly unreasonable." Id. at 1184. The Court concluded that this excuse "would not alone suffice to carry the day." Id. at 1184. Yet when weighing this excuse in combination with the other factors, the

15

Fifth Circuit held that the district court had abused its discretion by refusing to reopen the evidence to allow Walker to testify. Id.

In United States v. Peterson, 233 F.3d 101 (1st Cir. 2000), the First Circuit applied the Walker factors to the district court's decision not to reopen the evidence to allow the defendant to testify. During Henry Peterson's trial, the defense rested without submitting any evidence. Id. at 104. The court recessed, informing the jury that it would hear closing statements when the court reconvened. Id. at 105. During a charging conference, Peterson's counsel told the court that, despite having declined to testify during the defense case, Peterson now wished to testify. Id. Defense counsel also informed that court that, were Peterson allowed to testify, defense counsel would not be able to examine him for ethical reasons. Id. The court refused to reopen the evidence to allow Peterson to testify. Id. Like Jones, Peterson argued on appeal that the district court's refusal to reopen the evidence in order to let him testify violated his constitutional right to testify in his own defense. Id.

Like the Eighth Circuit in the Jones case, the First Circuit in Peterson emphasized that the right to testify in one's own defense was "not absolute" and that "a defendant does not have an unrestricted right to testify at any point during the trial." Id. at 106. The Court held that, as a general rule, a defendant who

16

wishes to testify "must do so before he rests his case; otherwise, he can move the trial court to reopen the evidence, but the choice whether to reopen is left to the court's sound discretion." Id. The First Circuit concluded that this "rule serves to ensure that the trial proceeds in a fair and orderly manner, with the defendant's testimony occurring when the judge, jury, and prosecution reasonably expect it." Id.

To determine whether the district court had abused its discretion, the First Circuit stated that it "look[s] to whether the court properly weighed the defendant's right to testify against the need for order and fairness in the proceedings." Id. In doing so, it applied the Walker factors. Id. at 106–07. As to the first factor, the timeliness of the motion to reopen, the Court noted that defense counsel had moved to reopen the evidence approximately half an hour after the defense had rested. Id. at 106. While that delay was small, the First Circuit still concluded that "the potential for disruption . . . was not insignificant," noting that the jury was expecting to hear closing arguments—not further testimony. Id. at 107.

The second factor, the character of the testimony to be offered, weighed against Peterson. Id. Ordinarily, the testimony of a criminal defendant is presumed to be inherently significant; however, Peterson's lawyer had informed

17

the court that ethical concerns would prevent him from examining Peterson. Id. This led the First Circuit to conclude that Peterson's testimony would not have been particularly valuable. Id.

The Court did not specifically discuss the third factor, the effect of granting the motion to reopen, except to state that the jury would have been confused by the timing of Peterson's testimony and the fact that he was not questioned by defense counsel. Id.

The First Circuit concluded that the final factor, the reasonableness of the excuse for the request to reopen, weighed strongly against Peterson. Id. Peterson offered "no excuse, let along a reasonable one" for why he had changed his mind about testifying. Id. The Court emphasized that any defendant seeking to have the evidence reopened in order to testify "owed the district court some sort of reasonable explanation for his sudden change in tack." Id. It explained that: "Without such a requirement of excuse, the rule generally limiting testimony to the evidence-taking stage of a trial would hardly be a rule at all, and it would be too easy for a defendant to postpone testifying for strategic reasons until after the close of evidence." Id. The result was that the First Circuit held the district court had not abused its discretion by refusing to reopen the evidence to allow Peterson to testify. Id.

18

**B.**

We join the <u>Jones</u> and <u>Peterson</u> Courts in holding that the defendant's right to testify generally must be exercised before the evidence-taking portion of the trial has closed. Here, the district court denied Byrd's request to reopen the evidence. Our review of that decision, considering the <u>Walker</u> factors, reveals that the court did not abuse its discretion.

The first two factors mitigate in Byrd's favor. His motion to reopen the evidence was made the day after the evidence had closed and before both closing arguments and the jury instructions. And, because it was the defendant himself who would have testified, we must consider the character of the testimony to have been of "inherent significance." <u>Walker</u>, 772 F.2d at 1179. <u>But cf.</u> <u>Peterson</u>, 233 F.3d at 107 (stating that the ordinary presumption concerning the inherent importance of the defendant's testimony did not apply where the circumstances indicated that the defendant intended to commit perjury).

The second two <u>Walker</u> factors, however, establish that the district court did not abuse its discretion in this case. Granting the motion to reopen could have prejudiced the prosecution because Byrd's request came after the government's witnesses had been released. We agree with the district court that it would have been "untenable" to allow Byrd to wait until the government's witnesses had been

19

released and then take the stand and "say whatever he want[ed] to without much fear of anybody being around to rebut it."

Furthermore, having already heard the testimony of the government's rebuttal witnesses, Byrd would have been in a position "to work his testimony around theirs," changing his story in order to avoid discrepancies between the rebuttal witnesses' testimony and the defense's case. Walker, 772 F.2d at 1180. Likewise, Byrd would also have been aware of what the rebuttal witnesses did not know, allowing him to "decide as a strategic matter that it would be safe . . . to testify to certain matters." Id. In Byrd's case, unlike in Walker's, the government's rebuttal witness had provided testimony that could have aided Byrd in formulating his own testimony. Byrd, for example, heard testimony impeaching his alibi witnesses. Were he inclined to do so, Byrd was in a better position to manufacture explanations, smoothing over to some extent the discrepancies between the testimony of his alibi witnesses and the government's rebuttal witness. The potential prejudice to the government had the evidence been reopened weighs strongly against Walker's position.

As to the last factor, Byrd offered the district court no reasonable explanation for his newly found desire to testify. He merely changed his mind. The requirement that a defendant offer a valid explanation for seeking to testify

after the close of evidence is an important one. As the First Circuit noted, "[w]ithout such a requirement of excuse, the rule generally limiting testimony to the evidence-taking stage of the trial would hardly be a rule at all, and it would be too easy for a defendant to postpone testifying for strategic reasons." Peterson, 233 F.3d at 107. We cannot foresee how a district court could abuse its discretion by refusing to reopen the evidence to allow a defendant to testify where the defendant has given no valid reason for not testifying at the proper time.

Given the prejudice that the government might have suffered were the evidence reopened and given Byrd's failure to offer an explanation for his decision not to testify during the evidence-taking portion of the trial, we conclude that the district court did not abuse its discretion.

## III.

Byrd next argues that the district court erred by denying his motion for a judgment of acquittal as to the first two counts of his conviction. We review whether the record contains sufficient evidence to support a jury's verdict de novo. United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994). In so doing, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices drawn in the government's favor. Id. "A conviction must be upheld unless the jury could not have found the defendant

guilty under any reasonable construction of the evidence." <u>United States v. Chastain</u>, 198 F.3d 1338, 1351 (11th Cir. 1999).

Nine eyewitnesses established that the National Bank of Commerce was robbed by an African-American male generally matching Byrd's age, height, and weight. Clothes matching those worn by the robber were found in Byrd's closet, including a mask with eye holes. A gun resembling the one used by the robber was found in Byrd's car. A person appearing to be the robber drove away in a car with tag number 7821 AWA, a tag number that was registered to and was on Byrd's car at the time. The government's rebuttal witness challenged the testimony of Byrd's alibi witnesses. And then there was the money found in Byrd's possession.

The robber took $4,680 from the bank, and the police found $4,650 in a box under Byrd's bed. The $30 difference may be accounted for by the fact that the robber dropped some of the money he had stolen while he was running from the bank. The eyewitnesses testified that, while in the bank, the robber had not been able to hold on to all the cash he had grabbed. The jury could have reasonably concluded that the robber continued to drop cash outside the bank as he made his getaway on foot. Waters and Special Agent Watkins found a total of $15 when they retraced the steps of the suspicious man Waters saw, whom the jurors

presumably found to be Byrd. The jury could have reasonably concluded that Byrd had dropped another $15 that was not recovered, possibly because it had been blown away by wind or picked up by a passerby.

The record contains sufficient evidence to support the jury's verdict of guilt. Thus, the district court did not err in denying Byrd's motion for a judgment of acquittal.

## IV.

Byrd alternatively contends that the district court abused its discretion by denying his motion for a new trial because the jury's verdict, as to the first two counts, was against the weight of the evidence. We review the district court's denial of a motion for a new trial for abuse of discretion. United States v. Anderson, 326 F.3d 1319, 1326 (11th Cir. 2003), cert. denied, 540 U.S. 825, 124 S. Ct. 178 (2003). As summarized above, there is ample evidence to support the jury's verdict. Accordingly, the district court did not abuse its discretion in denying Byrd's motion for a new trial.[2]

**AFFIRMED.**

---

[2] Byrd has not raised , or attempted to raise, any issue related to United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005), so we have no occasion to decide whether that decision might affect his case.