[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11375
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00436-CR-T-26-MSS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO ROBERT MADDOX,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(February 27, 2009)**

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

Antonio Robert Maddox appeals his convictions on one count of possession

with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii) ("Count One"); one count of possession with intent to distribute 3, 4-methylenedioxymethamphetamine ("MDMA"), in violation of 21 U.S.C. § 841(a)(1) ("Count Two"); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Three"). Maddox contends the district court erred in denying (1) his motion to suppress evidence and (2) his motion for a judgment of acquittal as to Count Three. After review, we affirm.

## I. BACKGROUND

On August 26, 2007, the Hillsborough County, Florida Sheriff's Department received an anonymous complaint concerning drug activity at Appellant Maddox's apartment. Deputy Sheriffs Jeremy Manis and Kyle Cummings went to investigate. Maddox answered the door and spoke with the officers. Afterward, Manis and Cummings entered the apartment with Maddox and saw, in plain view, a bong, several marijuana cigarette butts, a .25-caliber handgun, and an AR-15 rifle. The officers arrested Maddox for possession of marijuana and obtained a warrant to search the apartment more thoroughly. A post-warrant search revealed cocaine and MDMA (i.e., "ecstasy"), plus a cocaine cutting agent, a scale, and marijuana.

2

Maddox moved to suppress the evidence, including the firearms, drugs, and drug paraphernalia. Maddox argued that the officers entered his home without consent and later obtained a search warrant that lacked probable cause. The government maintained that Maddox voluntarily consented to the initial, limited search of his apartment, and that after his arrest he revoked his consent, and the officers then obtained a valid search warrant.

## A.    Evidence at Suppression Hearing

At the suppression hearing, Deputy Manis testified that when he and Cummings arrived at Maddox's apartment, Maddox answered the door and spoke with the officers. Manis explained that he and Cummings were there to investigate a report of drug activity, and asked Maddox if they could come in and look around. Manis told Maddox they were there to look for "any marijuana grows or major drug dealing going on," and that Manis wanted to close out the complaint. He told Maddox he would not look through any of Maddox's drawers without asking. Manis did not remember the precise words Maddox said in reply but "it was either okay or all right." Maddox went inside, and Manis and Cummings followed.

When they entered the kitchen, Deputy Manis saw in plain view on the kitchen counter a red bong and a marijuana roach. They proceeded to the living room, where Manis saw a small handgun sitting on a table and two ashtrays with

3

numerous marijuana roaches in them. Manis walked to the entrance to Maddox's bedroom and saw an AR-15 rifle leaning against the wall next to Maddox's bed. The officers secured the firearms, and Manis asked Maddox if he had any more weapons. Maddox said no.

Deputy Manis entered the bedroom and asked Maddox if he could look under the mattress, and Maddox said yes. Manis lifted the mattress and saw a handgun underneath. Maddox, who was standing near to Manis, bent down, and Manis pushed him away, thinking he was reaching for the gun. Manis secured the third gun. All three guns were loaded.

Deputy Manis then placed Maddox in handcuffs and told him he was under arrest for possession of marijuana and marijuana paraphernalia. Maddox's roommate Barry Murphy came out of a second bedroom, and the officers detained him for safety purposes. Manis called for backup.

Three other officers arrived, and one of them asked Maddox if they could search the kitchen area. Maddox said not unless they had a warrant. Manis then left and obtained a search warrant. After getting the search warrant, the officers performed a thorough search of the apartment, including a safe found in Maddox's bedroom closet. The safe contained a large amount of MDMA pills and powder cocaine. In drawers in the kitchen, the officers found more cocaine and marijuana,

plus a bundle of cash, a scale, and a cutting agent for the cocaine.

Maddox's roommate Barry Murphy testified he had lived in the apartment for several months by the time of Maddox's arrest, but had never noticed an ashtray full of marijuana cigarettes, had never seen anyone smoke marijuana in the house, did not know whose guns were in the house, and had no knowledge of any illegal activity going on in the apartment. Murphy testified that he worked nights and slept all day and was not in the apartment often.

Murphy testified that on the afternoon of Maddox's arrest, he was in bed when the officers arrived, but awoke and heard most of Maddox's conversation with the officers. Murphy heard the officers ask if they could come inside and look around. Murphy testified that he heard Maddox ask if they had a search warrant, and they replied that they just wanted to look around. That was the last thing Murphy heard before he was called out of his room and put in handcuffs. Murphy testified that Maddox told the officers that they couldn't come in without a search warrant, and that Murphy never heard Maddox give the officers consent to enter.

Maddox testified that he answered the door and spoke to the officers. He testified that Manis asked to search the apartment and said if Maddox would let him inside to look around, Manis "would close the complaint out and he wouldn't be back." Manis did not say that he would leave if Maddox's home was not a

5

major grow house or a major drug operation. Maddox testified that he told the officers they could not come in without a search warrant. Then Maddox stepped back to close the door, and the officers stepped forward; Maddox retreated a little more and the officers walked into the apartment. At that point Maddox walked quickly into his bedroom and tried to throw a blanket over the AR-15 because he feared he would be arrested if the officers saw it. Maddox was in his bedroom for a minute and a half to two minutes while the officers were looking around the kitchen area.

Manis picked up the .25-caliber handgun in the living room and asked Maddox if there were any more guns in the apartment. Maddox said no. Manis then walked into Maddox's bedroom, and Manis saw the AR-15 and again asked Maddox if there were any more guns in the apartment. Maddox again said no. Then Manis lifted the mattress and saw the .45-caliber handgun.

Maddox testified that he did not reach for the gun, and Manis never pushed him. Instead, Manis handcuffed him, put him on the couch, and detained Murphy as well. Maddox testified that the officers kept trying to get him to consent to their searching the house, and Maddox insisted that they obtain a search warrant. Maddox conceded that the items the officers found belonged to him and not to Murphy.

6

**B.      District Court's Ruling**

The district court denied the motion to suppress.  The district court noted that it had considered the witnesses' credibility.  The district court concluded that Murphy had "absolutely no credibility."  With regard to Manis's testimony, the district court found "nothing perjurious."  The district court found that the fact that Manis obtained a search warrant for his in-depth search of the kitchen was more consistent with Manis's testimony about withdrawn consent than with Maddox's allegation of no consent.  The district court gave "very little weight" to Maddox's testimony.  The district court instead found that Maddox agreed to let the officers enter, even with misdemeanor amounts of marijuana and legal firearms in plain sight, in the hope that they would not pursue their investigation further, but withdrew his consent "after the stakes became higher."  The district court found that the officers' initial entry was pursuant to knowing and voluntary consent on Maddox's part, that he later withdrew his consent, and that the officers obtained a valid search warrant.

Maddox argued that the search was nonetheless unlawful because the warrant was invalid.  In that regard, Maddox noted that while Manis was going to get the warrant, one of the officers had told Manis over the radio that Maddox had consented to a further search of the kitchen, but Manis had omitted this fact from

7

his warrant application. The district court concluded that that fact did not invalidate the search warrant. Thus, the district court denied the motion to suppress.

## C. Bench Trial

After the suppression hearing, Maddox waived his right to a jury trial, and the case proceeded to a bench trial. At trial, Deputy Manis gave testimony that was substantially the same as his testimony at the suppression hearing. Manis also testified that the AR-15 was about nine to eleven feet away from the closet where the officers found Maddox's safe, and the .45 was located at the edge of the mattress, which was about five to seven feet from the closet door. Also, no guns were found in the kitchen area, and none of the guns were stolen.

The government also called Bernard Grall and Mark Dutton, two of the deputies who arrived at Maddox's apartment after Manis called for backup. Deputy Grall testified that he searched the safe in Maddox's bedroom closet and it contained cocaine, MDMA, and Maddox's driver's license and social security card. Grall also found, by the dresser in Maddox's bedroom, a box of bullets for the AR-15 and other bullets for the .45.

Deputy Dutton testified that he engaged Maddox in conversation after Deputy Manis left to get the search warrant. At one point Maddox told Dutton that

he had marijuana in the kitchen and that the officers could get it if they wanted to. Dutton radioed Manis and told him that Maddox was offering consent to look in the kitchen, but Manis said they would proceed with obtaining the search warrant. After they obtained the warrant, Deputy Dutton searched the kitchen, where he found cocaine, marijuana, an electric scale of the type used to weigh narcotics, a cutting agent, and a wad of cash which he believed was less than $100. They did not find any guns in the kitchen.

The government also called Murphy, who testified that the drugs belonged to Maddox and that Maddox had admitted the drugs were his. The government rested, and Maddox renewed his motion to suppress and moved for a judgment of acquittal as to all counts. The district court denied both motions.

Maddox called Deputy Cummings, who testified that when he and Manis arrived at Maddox's apartment, Manis asked if they could look around and Maddox said "he had no problem with us looking around." Maddox then rested and renewed his earlier motions, which the district court again denied.

The district court found Maddox guilty on all three counts. With respect to Counts One and Two, the district court found beyond a reasonable doubt that Maddox possessed cocaine and MDMA, and "given the quantity of these drugs, plus the additional factors of a cutting agent and the scale, that he was possessing

9

these drugs with the intent to distribute them." With regard to Count Three, the district court found that Maddox was using the firearms in furtherance of and in relation to the drug trafficking offenses, noting that (1) the weapons were not ones a hunter would use, (2) all three guns were loaded, (3) there was a substantial quantity of bullets, "as if [Maddox] was preparing for a small war," and (4) Maddox was dealing drugs out of the apartment. Thus, the district court found, it could reasonably be inferred that the firearms were being used to protect the drugs, and Maddox met the requirements for a § 924(c)(1)(A)(i) conviction.

After a sentencing hearing, the district court sentenced Maddox to concurrent 78-month imprisonment terms as to Counts One and Two, and a consecutive 60-month imprisonment term as to Count 3. Maddox appealed.

## II. DISCUSSION

### A. Motion to Suppress

"In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo." United States v. Martinelli, 454 F.3d 1300, 1306 (11th Cir. 2006). We construe the facts in this case in the light most favorable to the government, as it was the prevailing party in the district court. United States v. Newsome, 475 F.3d 1221, 1223-24 (11th Cir. 2007). We are not limited to a review of the evidence

presented at the suppression hearing; instead, we may consider the entire record, including trial testimony.  Id. at 1224.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects.  The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . from the individual whose property is searched . . . ."  Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797 (1990) (citations omitted).

Maddox mainly argues that the district court improperly credited the police officers' testimony, while discounting the testimony of Maddox and Murphy.  We disagree.  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  We have noted that, when police officers' testimony is in direct conflict with a defendant's testimony, "a trial judge's choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony."  Id. (quotation and ellipsis omitted).

There was nothing improbable about the testimony of Deputy Manis and the other officers.  The testimony of the various officers – particularly Manis and

11

Cummings – was consistent. And as the district court noted, the fact that Manis obtained a search warrant for the later search of the kitchen made more credible his assertion that Maddox had consented to an initial search of the apartment but refused to consent to a more in-depth search that would have revealed the cocaine and MDMA. It was not unreasonable for the district court to find that Maddox would consent to a limited search, even though it would reveal a misdemeanor amount of marijuana, in an attempt to get the officers to close out the complaint they were investigating before it potentially revealed more serious drug crimes.

Maddox also argues that, even if he did consent, his consent was not voluntary because it was the product of trickery and deceit on Deputy Manis's part. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973). "Normally, we will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred." United States v. Fernandez, 58 F.3d 593, 596-97 (11th Cir. 1995) (quotation omitted).

The district court's finding that Maddox consented voluntarily to the

12

officers' entry into and initial search of his apartment is not clearly erroneous. In evaluating voluntariness of consent, a court "should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004). Crediting Deputy Manis's testimony, as the district court was permitted to do, Manis told Maddox only that they were looking for major drug operations and that he wanted to close out the complaint. Maddox cooperated with the officers until the third gun was found beneath his mattress. Maddox acknowledges that he knew he had the right to refuse consent, a fact supported by the fact that he later denied consent to a search of the kitchen, and does not argue that he was uneducated or unintelligent. Under the circumstances, we see no cause to reverse the district court's conclusion that Maddox consented voluntarily.[1]

---

[1]Because the district court properly concluded that Maddox voluntarily consented to the officers' initial search, we need not inquire whether the later-obtained search warrant was tainted by an initial illegal search, as Maddox argues. See Ramirez-Chilel, 289 F.3d at 753 ("[W]e need not examine whether the post-arrest statement was tainted as fruits of an initial illegality because we find no initial illegality."). Further, Maddox cannot show that the warrant was invalid based on Manis's failure to include in his warrant application the fact that Maddox later gave consent to search because such information was not needed for the warrant to be supported by probable cause. See United States v. Steiger, 318 F.3d 1039, 1046 (11th Cir. 2003) ("To justify suppression of evidence seized under a warrant, the alleged deliberate or reckless failure to include material information in the affidavit must conceal information that would defeat probable cause."); United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990) (noting that

We recognize Maddox's argument that any consent was invalid because it was based on the deputies' deceitful representation that they would not arrest Maddox so long as they found no evidence of a major drug operation occurring in the apartment. The evidence does not support this argument. Maddox himself testified that Deputy Manis never told him the police would leave without charging him if they did not find evidence that Maddox's home was a major marijuana grow house or drug operation.

Because the district court did not clearly err in finding credible Manis's testimony that Maddox gave the police consent to enter his apartment, and did not clearly err in finding that Maddox's consent was voluntary, the court did not err in denying Maddox's motion to suppress evidence seized from the apartment.

B.    **Motion for Judgment of Acquittal**

We review <u>de novo</u> whether sufficient evidence supports a jury's verdict. <u>United States v. Byrd</u>, 403 F.3d 1278, 1288 (11th Cir. 2005). "[W]e view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices drawn in the government's favor. A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." <u>Id.</u> (quotation marks and citation

---

insignificant or immaterial omissions will not invalidate a warrant).

14

omitted).

Section 924(c) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," shall be subjected to additional punishment. 18 U.S.C. § 924(c)(1)(A). The "in furtherance" element of a § 924(c) offense requires proof of a nexus between the firearm and the drug trafficking offense. United States v. Molina, 443 F.3d 824, 829 (11th Cir. 2006).

> The nexus between the gun and the drug operation can be established by the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.

United States v. Timmons, 283 F.3d 1246, 1253 (11th Cir. 2002) (quotation omitted). A jury may infer that the purpose of a firearm located near drugs is to provide defense or deterrence in furtherance of a defendant's drug trafficking activity. United States v. Miranda, 425 F.3d 953, 962 (11th Cir. 2005).

We reject Maddox's argument that the evidence was insufficient to sustain a § 924(c) conviction. There was evidence that: (1) Maddox possessed in his apartment, with intent to distribute, a substantial quantity of cocaine and MDMA; (2) Maddox possessed two guns within nine to eleven feet of the safe containing cocaine and MDMA, and a third gun nearby; (3) although two of the weapons were

15

handguns, the third was an AR-15 rifle; (4) all three guns were loaded; and (5) there was a large amount of ammunition present.  This evidence was sufficient to establish the required gun/drug trafficking nexus under § 924(c).  See United States v. Thompson, 473 F.3d 1137, 1143-44 (11th Cir. 2006) (Section 924(c) "in furtherance of" nexus sufficiently shown by evidence that two hidden but readily accessible handguns were in living room where drugs were packaged for sale); Molina, 443 F.3d at 829-30 (evidence sufficient to establish gun/drug trafficking nexus where firearm was in drawer of nightstand in bedroom and drugs, digital scales, and large amount of money were in bedroom closet).  Thus, the district court did not err in denying Maddox's motions for a judgment of acquittal as to Count Three.

## III.  CONCLUSION

For the reasons stated above, we conclude that the district court did not err in denying Appellant Maddox's motion to suppress or motion for a judgment of acquittal as to the 18 U.S.C. § 924(c) charge.

**AFFIRMED.**