[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10268
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 4, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 07-00014-CR-4-SPM-CS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE WILMER GUARIN MELCHOR,
a.k.a. Jose Wilson-Marin,
a.k.a. Jonatan,
a.k.a. Toti,
a.k.a. Toty,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 4, 2010)

Before BIRCH, CARNES and ANDERSON, Circuit Judges.

PER CURIAM:

Jorge Wilmar Guarin Melchor ("Melchor") appeals his convictions for conspiring and aiding and abetting others to import, transport in interstate and foreign commerce, and harbor illegal aliens. He contends there was insufficient evidence to support his convictions. After careful review of the record, we AFFIRM.

## I. BACKGROUND

Melchor was charged in an eight-count indictment with conspiracy to import illegal aliens for the purposes of prostitution, transport illegal aliens in interstate and foreign commerce for purposes of prostitution, and harbor illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 18 U.S.C. § 371 (count one); concealing and harboring illegal aliens for purposes of financial gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i) (counts two and three); aiding and abetting the importation of illegal aliens for purposes of prostitution, in violation of 8 U.S.C. § 1328 and 18 U.S.C. § 2 (counts four and five); aiding and abetting the transportation of an individual in interstate and foreign commerce for purposes of prostitution, in violation of 18 U.S.C. §§ 2421 and 2 (counts six and seven); and illegal reentry by a deported alien, in violation of 8 U.S.C. § 1326(a) (count eight).

2

Melchor pled guilty to count eight prior to trial. In May 2007, a jury found him guilty of the remaining seven counts. In January 2009, the court sentenced Melchor to concurrent terms of 96 months in prison on each count from one through seven, and 24 months on count eight, to be followed by a total of three years of supervised release.

At trial, "Wendy" and "Angelica",[1] both Guatemalan citizens, testified that they were smuggled into the United States from Guatemala by a series of "coyotes" or human traffickers. Both Wendy and Angelica hoped to create a better life for their families by working in America. Wendy was told before the trip that it would cost $16,000, which she would pay back through her earnings as a waitress. Angelica was similarly told that she would pay for her travel by working as a waitress in the United States, although she was not told up front the exact amount. Each woman was instructed to bring only minimal clothing.

The arduous journey spanned 15 days. Communicating via cell phone, coyotes shepherded Wendy and Angelica through Guatemala across a river into Mexico. Before crossing into Mexico, a coyote confiscated their identification documents. Another person named "Sandy" joined the two women in Mexico. The women then sailed with three coyotes across the Rio Grande River into Texas.

---

[1] We omit reference to their full names to protect their privacy.

They trekked for several days through the woods until another coyote picked them up in a van and drove them to Houston. From there, a new coyote transported them to Tallahassee, Florida. Along the way, the driver arranged to have someone meet them in Tallahassee. Melchor was waiting for the women when they arrived in Tallahassee on Friday, 14 July 2006.

Melchor took the women to his home. Speaking in Spanish to Wendy and Angelica, he asked them their names and where they were from. Both women said they were from Guatemala. Melchor informed them the trip cost $16,000, which they would pay back by working as prostitutes. When they indicated they thought they would have a different job, Melchor did not respond. Melchor then took the three women clothes shopping. Afterwards, Melchor instructed Wendy and Angelica "to get ready . . . to go to the job." R4 at 81.

Melchor drove Wendy and Angelica to a trailer, where he explained that six men inside "would choose which one would have sex with them." Id. at 84. Wendy had sex with five of the men, using condoms that Melchor had provided. Each of these men paid Melchor $30. Melchor proceeded to a second trailer, where Angelica went inside alone and had sex with seven or eight men. At the next two trailers, both women had sex with several men. At this point, they told Melchor they wanted to stop, but he replied that they needed to have sex with at

4

least 12 to 15 men per night because other women had serviced up to 25 men a night. Melchor took them to at least ten trailers that night.

Early the next morning, Melchor again ordered Wendy and Angelica "to get ready because [they] had to go out again." Id. at 92. When Wendy protested, Melchor immediately called someone to complain. Sandy and another man told Wendy and Angelica that they would have to keep working in order to pay off their debt, referring to their travel expenses for being brought into the United States. That Saturday night, Angelica and Sandy went with Melchor to nine or ten trailers, where they both had sex in exchange for money paid to Melchor. Wendy refused to go, stating that she had no clothing.

On Sunday morning, 17 July 2006, Wendy and Angelica planned their escape. As soon as Melchor left with Sandy to buy more clothes, Wendy and Angelica ran out of the house. They knocked at several houses before a woman finally opened her door and let them in. Both Wendy and Angelica were crying and shaking, and they looked "scared to death." Id. at 31. With the help of a Spanish translator, the neighbor learned that the women had been held as sex slaves. The neighbor then contacted the police.

Several of Melchor's clients testified at trial that Melchor, known as "Toty," regularly supplied them with women from Central and South America to have sex

with for fifteen minutes for $30. One man remembered paying for sex with a Guatemalan woman on Friday night, 14 July 2006. Melchor told one of his customers that the women came from Central American countries. When a client asked Melchor why he brought certain women, Melchor explained that he supplied whoever "they were giving to him." R5 at 246. Another customer testified that one of the women had fresh marks and scratches resembling the ones he received from thorny bushes when he illegally entered the United States.

From January through July 2006, Melchor made over 2100 cell phone calls to long-distance numbers. Most of the calls were to Florida, Texas, and Georgia. Of the Texas calls, the majority involved Houston numbers. Melchor made an additional 833 calls using a calling card for long-distance and international numbers. He supplied Angelica with a calling card and his phone so that she could contact her husband in Guatemala. During the three days that Wendy and Angelica were in Melchor's custody, Melchor received at least 35 calls from Guatemala.

Melchor did not move for a judgment of acquittal at the close of evidence. He raises only one issue on appeal – whether there was sufficient evidence to support the jury's verdict on counts one through seven. Melchor concedes that he ran a prostitution business and used Wendy and Angelica as prostitutes. However, he contends that there was no evidence showing he conspired, or aided and abetted

6

others, to (1) smuggle them into the United States, (2) transport them across state lines from Texas to Florida, or (3) harbor them as illegal aliens.

## II. DISCUSSION

We review de novo whether there is sufficient evidence to support a jury's verdict. United States v. Byrd, 403 F.3d 1278, 1288 (11th Cir. 2005) (per curiam). Where, as here, a defendant fails to move for a judgment of acquittal at trial, we review the sufficiency of the evidence only for a miscarriage of justice. See United States v. Tapia, 761 F.2d 1488, 1491 (11th Cir. 1985). In order to reverse, the evidence on a key element of the offense must be "so tenuous that a conviction would be shocking." Id. at 1492 (quotation marks and citation omitted). Moreover, we must evaluate the evidence, including all reasonable inferences and credibility choices, in the light most favorable to the government. See Byrd, 403 F.3d at 1288.

A. Importation

Melchor first challenges his convictions for importing illegal aliens for the purpose of prostitution, which constituted an overt act of the conspiracy count (count one) and two of the substantive counts (counts four and five). A person is guilty of importing an alien into the United States for the purpose of prostitution if he:

7

directly or indirectly, import[s] . . . into the United States any alien for the purpose of prostitution . . . , or shall hold or attempt to hold any alien for any such purpose in pursuance of such illegal importation, or shall keep, maintain, control, support, employ, or harbor in any house or other place, for the purpose of prostitution . . . any alien, in pursuance of such illegal importation[.]

8 U.S.C. § 1328 (2009). Whoever aids or abets in the commission in an offense against the United States is punishable as a principal. See 18 U.S.C. § 2(a) (2009). A person aids or abets a crime if he "associate[s] with the venture in some way and participate[s] in it as something [he] wishes to bring about." United States v. Cole, 704 F.2d 554, 559 (11th Cir. 1983).

Melchor argues that there was no evidence that he knew Wendy and Angelica had illegally crossed the border into the United States. According to Melchor, the evidence merely showed that he knew the women were from Guatemala, they spoke only Spanish, and they owed $16,000 for an unknown reason. He also contends there was no evidence connecting him with any of the coyotes who transported the women across the border and then later across state lines.

The record does not support Melchor's interpretation of the evidence. One of the first questions Melchor asked Wendy and Angelica was where they were from. Both women stated they were from Guatemala. The women then asked Melchor "how much would the trip cost us. And he told us $16,000." R4 at 67.

8

Melchor immediately told the women they would have to pay it back by working. Contrary to Melchor's argument, the jury could reasonably infer from this evidence that Melchor knew the reason for their $16,000 debt was to pay for their trip from Guatemala.

There was also more than sufficient evidence to connect Melchor to the coyotes who illegally imported Wendy and Angelica into the United States and transported them across state lines. The journey from Guatemala to Tallahassee involved a careful, elaborate orchestration of numerous coyotes who met the women at designated locations. Melchor was the last stop of their two-week trek. Wendy testified that the Houston coyote called someone in Tallahassee and told that person to wait for them. After driving all night from Houston to Tallahassee, the coyotes transferred the women to one person – Melchor. It is a reasonable inference that the coyotes would not deliver the women to Melchor unless he was involved in their importation scheme. Furthermore, the jury heard evidence that Melchor received numerous international calls from Guatemala, that he had told a former client that the prostitutes were from Central American countries, and that he had stated that he supplied whatever women were brought to him. Viewing the evidence in the light most favorable to the government, a jury could reasonably conclude that Melchor was involved in an international conspiracy to import illegal

aliens, including Wendy and Angelica, for the purpose of prostitution, and actively aided and abetted others in that importation.

Accordingly, we find no miscarriage of justice in Melchor's convictions for importation in counts one, four and five.

B.  Transportation

Melchor next argues that there is insufficient evidence to support his convictions in counts one, six, and seven for conspiring to transport, and aiding and abetting the transportation of, individuals for purposes of prostitution. Pursuant to 18 U.S.C. § 2421, a person is prohibited from knowingly transporting someone in interstate or foreign commerce with the "intent that such individual engage in prostitution[.]"  18 U.S.C. § 2421 (2009).  Melchor asserts there was no evidence that he participated in, assisted with, or even knew of Wendy and Angelica's illegal transportation from Guatemala through Mexico into Texas, and from there to Florida.

The record reveals no miscarriage of justice.  The evidence showed that Melchor staffed his prostitution business with women from Central American countries who were supplied by other individuals.  The high volume of long-distance and international calls to and from his cell phone indicates his participation in an international operation to transport women illegally into the

10

United States for the purpose of prostitution. As part of this ongoing operation, Melchor obtained custody of Wendy and Angelica from a coyote. Even though he knew they had traveled from Texas, he still questioned them as to where they were from. He voiced no surprise when he learned the women were from Guatemala and readily provided Angelica with a calling card to contact her husband in Guatemala. He knew the cost of their trip and put them to work as prostitutes that same night, collecting any money they earned. When they refused to go out the next day, Melchor promptly called another individual, who instructed the women that they had to keep working as prostitutes in order to pay for their trip to the United States. The jury could reasonably infer from this evidence that Melchor not only knew the women had been illegally transported from Guatemala into Texas and then across state lines to Florida, but that he conspired and actively assisted others to transport them with the intent to use the women as prostitutes for his own monetary gain. Accordingly, we affirm Melchor's transportation convictions in counts one, six, and seven.

C. Harboring

Melchor's final challenge pertains to his convictions for harboring, as contained in counts one, two, and three. He acknowledges that he harbored Wendy and Angelica by providing them with food, clothing, housing, and employment.

11

However, he contends there was insufficient evidence that he either knew or recklessly disregarded the fact that the women were illegal aliens.

Under 8 U.S.C. § 1324, a person is subject to ten years of imprisonment if he:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation[.]

8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i) (2009). A person acts with reckless disregard if he is "aware of, but consciously and carelessly ignore[s], *facts and circumstances* clearly indicating that the person transported was an alien who had entered or remained in the United States in violation of law." United States v. Perez, 443 F.3d 772, 781 (11th Cir. 2006) (quotation marks and citation omitted) (emphasis in original). Additionally, reckless disregard includes "deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that the alleged aliens were in fact aliens and were in the United States unlawfully." Id. (quotation marks and citation omitted).

There were numerous facts and circumstances here clearly indicating that Wendy and Angelica were unlawful aliens, and that Melchor either knew or recklessly ignored these facts. Melchor knew they were from Guatemala and

12

spoke only Spanish. He never asked them for identification papers; if he had, he would have learned they had none. He knew they had been transported by a coyote from Texas. He knew they carried very few clothes and would need to buy more. In addition to clothing, he knew he was supposed to provide them with housing and food. He knew their trip cost $16,000, that they had not paid for it, and that they would be working as prostitutes to pay it back. Finally, Melchor knew that Angelica still had ties to Guatemala and provided her with a calling card and his phone to contact her family. These facts and circumstances indicate "the highest probability" that Wendy and Angelica were unlawful aliens. Id. (quotation marks and citation omitted). Additionally, a jury could draw a reasonable inference from this evidence that Melchor knew Wendy and Angelica were illegal aliens, or that he recklessly disregarded the relevant facts. The evidence regarding the element of "knowing or in reckless disregard" is therefore not "so tenuous that a conviction would be shocking." Tapia, 761 F.2d at 1492. Consequently, we affirm Melchor's convictions for harboring illegal aliens in counts one, two, and three.

## III. CONCLUSION

Based on the foregoing, we conclude that there was ample evidence to support Melchor's convictions on counts one through seven. No miscarriage of justice has been shown. Accordingly, we AFFIRM his convictions.

**AFFIRMED.**

13